IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:16-CV-85-D

| | |
|---|---|
| DEREK FELTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **ORDER** |
| | ) |
| MONEYSWORTH LINEN SERVICE, | ) |
| INC., PATRICK C. KEENAN, and | ) |
| JOHN D. KEENAN, | ) |
| | ) |
| Defendants | ) |

On December 29, 2016, Derek Felton ("Felton" or "plaintiff") filed a pro se complaint

against his former employer, Moneysworth Linen Service, Inc., ("Moneysworth"), and against

Patrick C. Keenan (Moneysworth's President) and John D. Keenan (Moneysworth's Vice President)

[D.E. 1]. Felton alleges age discrimination and retaliation pursuant to the Age Discrimination in

Employment Act of 1967, as amended, 29 U.S.C. §§ 621 to 639 ("ADEA"). See id. On August 15,

2017, Felton moved to quash his deposition [D.E. 14]. On August 28, 2017, defendants moved for

summary judgment [D.E. 15] and filed a memorandum in support [D.E. 17] and a statement of

undisputed material facts [D.E. 16]. On September 21, 2017, Felton responded in opposition [D.E.

21], and on October 3, 2017, filed his own affidavit [D.E. 22]. On October 9, 2017, defendants

replied [D.E. 23]. As explained below, the court grants defendants' motion for summary judgment

and denies Felton's motion to quash his deposition.

I.

Moneysworth is a linen company that serves hotels, motels, resorts, vacation rental

management companies, and the New Hanover Regional Hospital (the "Hospital"). See [D.E. 16]

¶ 1.[1] Moneysworth has regular customers located throughout Eastern Virginia and Eastern North Carolina. See id.

Since April 2008, Charles McCauley ("McCauley") has been Moneysworth's general manager. McCauley oversees all operations, including the cleaning, folding, and packing operations in Elizabeth City, North Carolina. See id. ¶ 3.

Since 2014, the Hospital has been a substantial year-round customer for Moneysworth. In contrast to the Hospital, many of Moneysworth's other customers are seasonal. See id. ¶ 5.

In November 2014, Moneysworth hired Felton as a delivery truck driver. All Moneysworth employees are employed on an at-will basis, and none (including Felton) has ever had a written contract for a definite term. Moneysworth uses a tractor trailer to serve the Hospital route. For most of Felton's employment, Felton and C.J. Harris were the primary drivers for the Hospital route. See id. ¶¶ 4, 6, 11.

Moneysworth serves the Hospital seven days per week. Initially, McCauley scheduled Felton to work four days per week and Harris to work three days per week. Felton and Harris had a driver's helper who rode with them and helped to unload and load linens. Sometimes, Moneysworth also employed an additional helper who was assigned to work at the Hospital to assist with the truck when it arrived. At all times, Moneysworth required the driver to assist in unloading and loading the truck. See id. ¶¶ 8–9.

---

[1] Defendants statement of undisputed material facts is "deemed admitted for purposes of the motion [for summary judgment] unless it is specifically controverted by a corresponding numbered paragraph in the opposing statement." Local Civil Rule 56.1(a)(2). Felton did not specifically controvert defendants' statement of undisputed material facts. See id. Thus, the court relies on defendants' statement of undisputed material facts and cites to the statement. See United States v. Compassionate Home Care Servs., Inc., No. 7:14-CV-113-D, 2017 WL 1030706, at *1 (E.D.N.C. Mar. 15, 2017) (unpublished). The statement cites the underlying evidence, and the court has reviewed that evidence.

Patrick Keenan and John Keenan work primarily from offices in Virginia Beach, Virginia, and Kitty Hawk, North Carolina, respectively. Each travel to the Elizabeth City facility on a weekly basis. At the Elizabeth City facility, John Keenan often saw Felton speaking with McCauley and it appeared to him that Felton occupied a lot of McCauley's time even though McCauley was not his supervisor. Rather, Dawn Fortenberry was Felton's supervisor. See id. ¶ 10.

Moneysworth follows a point system for taking disciplinary actions for attendance-related reasons. Moneysworth does not use a point system for any disciplinary infractions other than attendance. See id. ¶ 13.

In June 2015, Felton was ticketed for exceeding a safe speed. See id. ¶ 15. In October 2015, Felton was involved in a single-vehicle accident when his truck hit a pole in Vanceboro, North Carolina while driving to the Hospital. See id. ¶ 16. On November 2, 2015, Felton received a disciplinary warning for failing to ensure that the battery charger on his truck was properly connected. See id. ¶ 17.

In 2015, Hospital representatives telephoned McCauley and others at Moneysworth and complained about Felton. The Hospital representatives complained that Felton was moody, was difficult, rushed people, asked Hospital employees to assist him to load and unload linens, and often failed to remove all dirty linens from the Hospital. See id. ¶¶ 18–19. McCauley received more complaints concerning Felton than any other driver. McCauley told Felton about the complaints and told Felton that Moneysworth expected him to be courteous at all times and to remember that he was the face of Moneysworth. See id. ¶¶ 20–21.

Throughout 2015, McCauley had numerous conversations with Felton about Felton's duties and responsibilities to Moneysworth and the Hospital. See id. ¶ 22. On November 6, 2015, Felton emailed McCauley following one of these discussions. In the email, Felton complained that he did

3

"not have a contact person" once he arrives at the Hospital, which "puts me at a great disadvantage because if anything goes wrong, I have no voice in the matter." Ex. 10 [D.E. 16-18]. Felton also stated that he sometimes left dirty linens at the Hospital because he had to conserve energy before driving back. See id. Felton's email frustrated McCauley because loading and unloading linens at the Hospital was an essential part of Felton's duties. See [D.E. 16] ¶ 23. McCauley also believed that Felton incorrectly expected his helper and Hospital employees to load and unload the truck. See id. ¶ 24.

In January 2016, Deb Keenan became Moneysworth's human resources manager. Deb Keenan and McCauley met with each driver and had each sign a document entitled "Driver Responsibilities." See id. ¶ 25. On January 9, 2016, Felton signed his Driver Responsibilities document. See Ex. 11 [D.E. 16-19]. The Driver Responsibilities document confirmed the duties and responsibilities for all drivers, including Felton, to avoid any misunderstandings or disputes and to help eliminate customer complaints. See id. The Driver Responsibilities document accurately reflected the duties expected of all drivers, including Felton. See id.; [D.E. 16] ¶ 26.

In March 2016, McCauley received two emails from Debbie Arenas ("Arenas"), a Hospital representative, complaining about Felton. See id. ¶ 28; Exs. 12–13 [D.E. 16-20, 16-21]. After receiving the email complaints from Arenas, McCauley met with Felton and discussed the complaints and Moneysworth's concerns about his performance. See [D.E. 16] ¶ 29. While discussing Arenas's complaints, Felton complained to McCauley about the length of the route to the Hospital, the performance of his helper LaDon White ("White"), and being tired. As for White, Felton complained that White did not provide enough assistance and was "disgruntled." Felton also complained about being tired because of the length of the Hospital route, the time spent at the

4

Hospital, and the volume of linens that he had to help unload and load at the Hospital. See id. ¶¶ 30–31.

McCauley considered Felton's complaints and the Hospital's complaints. McCauley knew that he rarely received complaints from the Hospital when Harris worked. McCauley decided to revise the schedule and the assignment of the driver's helpers in order to address the concerns of Felton and the Hospital. See id. ¶ 33. Under the revised schedule, Felton and Harris would each work every other day. The revised schedule meant that one driver would work four days one week and then three days the next week, and the drivers would alternate between who drove four days each week. See id. ¶ 34.

Under the old schedule, Felton regularly worked more than 40 hours a week and was paid overtime for all hours worked over 40 hours in any work week. Felton worked four days each week and Harris worked three days each week. Felton averaged 48.73 hours per week versus 36.65 hours per week for Harris. Harris rarely worked over 40 hours. Felton had a higher hourly rate than Harris. Although reducing or controlling costs was not why McCauley revised the schedule, McCauley knew that the revised schedule would reduce costs. See id. ¶ 49.

McCauley also decided to assign William Chesson ("Chesson") to work as the primary helper for Felton. Chesson had been Harris's helper. McCauley felt Chesson could help reduce the time it took to unload and load linens at the Hospital when Felton was working. Chesson also held a CDL permit and could drive if Felton got tired. See id. ¶ 35.

Felton did not like the revised schedule and told McCauley that he wanted Moneysworth to use the old schedule. Specifically, Felton was unhappy about having his hours reduced. See id. ¶ 37.

At no time during Felton's employment did Felton ever complain to McCauley or anyone else at Moneysworth about his age or the relative ages of those who with whom he worked. Felton also

5

never told McCauley or anyone else at Moneysworth that he believed the revised schedule had anything to do with Felton's age or anyone else's age. Felton also never threatened to file or filed any kind of discrimination charge as a result of the revised schedule or anything else. See id. ¶¶ 42–43, 71.

Between March 30 and April 8, 2016, Felton and McCauley had three separate email exchanges about the revised schedule and other issues. See id. ¶ 45; Exs. 15,16, 18 [D.E. 16-23, 16-24, 16-26]. On March 30, 2016, the first email exchange occurred. McCauley told Felton that he decided to revise the schedule for two primary reasons. First, based on his discussion with Felton about the challenges of the Hospital route, including Felton's concerns about his driver's helper and the difficulties of retrieving all soiled linens, McCauley to Felton that "it is NOT the responsibility of the Hospital employees to assist us." Ex. 15 [D.E. 16-23] 1. Second, McCauley discussed the Hospital's complaints about arrival times, soiled linens, and conflict. McCauley wrote: "It[']s my obligation to the Company, employees, and customer to ensure smooth processes for all parties involved and based on those things I feel it is beneficial to have a change in rotations and see if we have any patterns of conflict that may need address[ing], whether it is on our end or the Hospital." Id.

On April 1, 2016, the second email exchange occurred. See [D.E. 16] ¶ 52; Ex. 16 [D.E. 16-24]. This exchange started with Felton stating that the revised schedule would "adversely affect me and my family by reducing my work hours which would significantly decrease my monthly income. Losing 22 [or more] hours monthly and awarding them to another employee from my view is unfair." Ex. 16 [D.E. 16-24] 1. Felton also claimed that he always had been respectful, that he understood everything had been resolved with the Hospital representatives, and requested "a thorough investigation." Id. at 2. Felton, however, did not specify what he wanted investigated. McCauley

responded that "I am not certain what I would be investigating." Id. at 1. McCauley also told Felton

that the revised schedule was not a disciplinary action and confirmed that he had revised the schedule

to give Felton two consecutive days off as Felton had requested. See id.

On April 4, 2016, in order to reduce or avoid complaints from the Hospital, McCauley gave

Felton a document entitled "Driver's Agreement." See [D.E. 16] ¶ 54; Ex. 17 [D.E. 16-25]. The

Driver's Agreement accurately reflected Felton's duties for Moneysworth. The Driver's Agreement

described Felton's points of contact at the Hospital, and suggested ways to avoid further problems

at the Hospital. On April 4, 2016, Felton signed and returned the Driver's Agreement to McCauley.

See [D.E. 16] ¶ 54.

On April 8, 2016, Felton initiated the third email exchange with McCauley. See id. ¶ 55; Ex.

18 [D.E. 16-26]. Felton told McCauley that Moneysworth had promised him a specific schedule

when he was hired and that Moneysworth should not be allowed to revise his schedule. See id.

Felton also requested a copy of what he called the "original agreement." Ex. 18 [D.E. 16-26] 1. By

"original agreement," Felton apparently meant a document reflecting the old schedule. See [D.E.

16] ¶ 57. No such document ever existed. McCauley responded to Felton's April 8 email and stated

that he had forwarded Felton's request to Deb Keenan and John Keenan. See id. ¶ 58.

Felton then exchanged a series of emails with Deb Keenan and copied John Keenan, Patrick

Keenan, and McCauley. See id. ¶ 59; Exs. 19–20 [D.E. 16-27, 16-28]. Felton asked to meet with

"management" to discuss the revised schedule and to get a copy of the "original document." See

[D.E. 16] ¶ 59. Deb Keenan responded and offered to meet with Felton to show Felton that there

was nothing in his personnel file supporting his claim that Moneysworth had ever promised him any

specific schedule or number of hours per week. Felton, however, declined to meet with Deb Keenan.

See id. ¶¶ 60–61. Instead, on April 10, 2016, Felton emailed Deb Keenan "requesting a justification

to my concerns in writing." See id. ¶ 61; Ex. 19 [D.E. 16-27] 3. Specifically, Felton asked Deb Keenan to provide him a written explanation for why McCauley had revised the schedule, why Felton never received a copy of the "original agreement," and why he was being "reprimanded." Id. In Felton's email of April 10, 2016, Felton acknowledged that he had never received or seen a document containing the "original agreement." Id.

In response to Felton's email of April 10, 2016, Deb Keenan sent Felton a copy of the "Driver Responsibilities" document. See [D.E. 16] ¶¶ 63–64. After Felton received it, he emailed Deb Keenan and said the document was not the "original agreement" and that he had "been told it would be put in writing. I never received it as promised." Id. ¶ 64; Ex. 20 [D.E. 16-28] 2.

McCauley had kept John Keenan and Patrick Keenan informed about Felton's complaints about the revised schedule and his requests for a copy of a document (i.e., the "original agreement") that Felton knew did not exist. McCauley told the Keenans that Felton was very difficult to satisfy but that McCauley was trying his best. McCauley also told the Keenans about Felton's frequent complaints and concerns about various things, and described how much effort McCauley expended concerning Felton. McCauley also told the Keenans about the Hospital's complaints about Felton, Felton's complaints about his helper and the route, and Felton's resistance to the revised schedule. The Keenans were very concerned that the Hospital, Moneysworth's largest customer, repeatedly had expressed concerns about Felton's performance. See [D.E. 16] ¶¶ 66–67.

Patrick Keenan and John Keenan decided to terminate Felton's employment. They believed that Felton was occupying too much of McCauley's time and was being unreasonable about the revised schedule. They also believed that Felton was being unreasonable in asking for a document that he knew did not exist and that the revised schedule and assignment of Chesson to help Felton were proper ways to seek to resolve the Hospital's concerns and Felton's concerns. They concluded

8

that Felton's biggest concern was his personal convenience, and that Felton was not concerned about Moneysworth's best interests. See id. ¶ 68.

The Keenans consulted with McCauley and Deb Keenan before terminating Felton's employment. Each supported the decision. See id. ¶ 69. At no time, did the Keenans, Deb Keenan, or McCauley discuss Felton's age. See id. ¶ 70.

On April 13, 2016, John Keenan met with Felton at the Elizabeth City facility. See id. ¶ 72. John Keenan told Felton that Moneysworth had decided to terminate Felton's employment for numerous reasons. At no time during this conversation did Keenan mention Felton's age. Moneysworth's dismissal form indicates "not a good fit for company" as the reason for Felton's dismissal. See Ex. 21 [D.E. 16-29] 1. No one from Moneysworth ever told Felton that Moneysworth terminated Felton because of his age. See [D.E. 16] ¶ 74.

When Moneysworth terminated Felton's employment, C.J. Harris (age 38), Lemuel Walker (age 58), and Felton (age 52) held full CDLs. See id. ¶¶ 6, 77. Chesson (age 37) also held a CDL permit at that time, and could drive a commercial vehicle when accompanied by another CDL holder. Moneysworth assigned Lemuel Walker and Chesson to take over Felton's schedule and service the Hospital. Moneysworth did not hire anyone to replace Felton. See id. ¶¶ 77–78.

## II.

Defendants seek summary judgment on Felton's claims that defendants fired him and retaliated against him in violation of the ADEA. In considering defendants' motion for summary judgment, the court views the evidence in the light most favorable to Felton and applies well-established principles under Rule 56 of the Federal Rules of Civil Procedure. See, e.g., Fed. R. Civ. P. 56; Scott v. Harris, 550 U.S. 372, 378 (2007); Celotex Corp. v. Catrett, 477 U.S. 317, 325–26 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–55 (1986); Matsushita Elec. Indus. Co.

9

v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson, 477 U.S. at 247–48. The party seeking summary judgment must initially come forward and demonstrate an absence of a genuine issue of material fact. See Celotex Corp., 477 U.S. at 325. Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact for trial. See Matsushita, 475 U.S. at 586–87.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. Conjectural arguments will not suffice. See id. at 249–52; Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party . . . cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). It is insufficient to show a "mere . . . scintilla of evidence in support of the [nonmoving party's] position . . . ; there must be evidence on which the [fact finder] could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252.

First, Felton claims that defendants discharged him because of his age in violation of the ADEA. See Compl. ¶¶ 20–22. The ADEA makes it unlawful for any employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

Felton named Patrick Keenan and John Keenan as defendants. An employee may bring an action under the ADEA only against "an employer" as that term is defined in 29 U.S.C. § 630(b). See 29 U.S.C. § 630(b); Causey v. Balog, 162 F.3d 795, 800–01 (4th Cir. 1998); Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 510–11 (4th Cir. 1994); accord Lissau v. S. Food Serv., Inc., 159 F.3d 177, 180-81 (4th Cir. 1998). Supervisors (such as the Keenans) who work for a corporate employer

10

(such as Moneysworth) are not "employers" under the ADEA and are not proper defendants. See, e.g., Causey, 162 F.3d at 800–01; Birkbeck, 30 F.3d at 510–11; accord Lissau, 159 F.3d at 180-81. Thus, the court grants summary judgment to Patrick Keenan and John Keenan.

As for Moneysworth, Felton has presented no direct evidence that Moneysworth discharged him because of his age. Rather, Felton proceeds under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Laber v. Harvey, 438 F.3d 404, 430 (4th Cir. 2006) (en banc); Mereish v. Walker, 359 F.3d 330, 334 (4th Cir. 2004). Under this framework, a plaintiff first must establish a prima facie case. See, e.g., O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996). If the plaintiff does so, the defendant employer must offer a legitimate non-discriminatory reason for the employment decision. See McDonnell Douglas, 411 U.S. at 802–03. If the defendant employer does so, the plaintiff has "an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981); see Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); King v. Rumsfeld, 328 F.3d 145, 150–54 (4th Cir. 2003). A plaintiff can demonstrate pretext by showing that the "explanation is 'unworthy of credence' or by offering other forms of circumstantial evidence sufficiently probative of age discrimination." Mereish, 359 F.3d at 336 (quoting Burdine, 450 U.S. at 256). To prevail, the plaintiff must prove not just that age was a motivating factor in the employer's adverse employment action, but rather must prove that "age was the 'but-for' cause of the employer's adverse decision." Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176 (2009); see Duffy v. Belk, Inc., 477 F. App'x 91, 93 (4th Cir. 2012) (unpublished); Bodkin v. Town of Strasburg, 386 F. App'x 411, 413 (4th Cir. 2010) (per curiam) (unpublished).

11

To establish a prima facie case of age discrimination under the McDonnell Douglas framework, Felton must prove that (1) he was in the age group protected by the ADEA; (2) he was discharged; (3) at the time of his discharge, he was performing his job at a level that met his employer's legitimate expectations; and (4) after his discharge, he was replaced by someone of comparable qualifications who was substantially younger. See O'Connor, 517 U.S. at 310–13; Ruff v. Target Stores, Inc., 226 F. App'x 294, 300–01 (4th Cir. 2007) (unpublished); Laber, 438 F.3d at 430; Howard v. College of the Albemarle, 262 F. Supp. 3d 322, 335 (E.D.N.C. 2017), aff'd, 697 F. App'x 257 (4th Cir. 2017) (per curiam) (unpublished); Wood v. Town of Warsaw, N.C., 914 F. Supp. 2d 735, 739–40 (E.D.N.C. 2012). Moneysworth concedes that Felton is in the protected age group and was discharged. Moneysworth, however, argues that Felton has failed to raise a genuine issue of material fact concerning (1) whether Felton was performing his job at a level that met Moneysworth's legitimate expectations when Moneysworth discharged him, and (2) whether, after Felton's discharge, Moneysworth replaced Felton with someone of comparable qualifications who was substantially younger.

Felton can meet his initial burden to demonstrate satisfactory job performance in two ways: he can show that he was meeting his employer's legitimate job expectations at the time of his discharge or he can show that the job expectations were illegitimate. See, e.g., Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 516–18 (4th Cir. 2006). Felton does not argue that Moneysworth had illegitimate expectations for his performance. Thus, Felton must demonstrate a genuine issue of material fact concerning whether he was performing his job at a level that met Moneysworth's legitimate expectations when Moneysworth discharged him.

The court has described the overwhelming evidence that Felton was not meeting Moneysworth's legitimate expectations when Moneysworth discharged him. Cf. Ruff, 226 F. App'x

at 301–03; <u>Diamond v. BEA Maurer, Inc.</u>, 128 F. App'x 968, 973 (4th Cir. 2005) (per curiam) (unpublished); <u>Walsh v. Ciba-Geigy Corp.</u>, 121 F.3d 702, at *2 (4th Cir. 1997) (per curiam) (unpublished table opinion); <u>Howard</u>, 262 F. Supp. 3d at 335. In opposition to this evidence, Felton argues that he believed he was performing well, and that Moneysworth's concerns were factually inaccurate. Although Felton believed that he was performing well, an employee's perception of his own performance cannot establish a genuine issue of material fact concerning whether the employee was meeting his employer's legitimate expectations. <u>See, e.g., King</u>, 328 F.3d at 149; <u>Smith v. Flax</u>, 618 F.2d 1062, 1067 (4th Cir. 1980). The same conclusion applies to the opinion of Felton's co-workers White and Stallings. <u>See, e.g., King</u>, 328 F.3d at 149; <u>Hawkins v. PepsiCo, Inc.</u>, 203 F.3d 274, 280 (4th Cir. 2000); <u>Tinsley v. First Union Nat'l Bank</u>, 155 F.3d 435, 444 (4th Cir. 1998), <u>overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101 (2002); <u>cf.</u> [D.E. 21-1] 9–11; [D.E. 21-1] 8. Moreover, the court does "not sit as a super-personnel department weighing the prudence of employment decisions." <u>Anderson v. Westinghouse Savannah River Co.</u>, 406 F.3d 248, 272 (4th Cir. 2005) (quotation omitted). Furthermore, even though Felton contests the factual accuracy of the critiques, the issue is whether the Keenans, the decisionmakers, believed the critiques to be true, and they did. <u>See Holland v. Wash. Homes, Inc.</u>, 487 F.3d 208, 215–17 (4th Cir. 2007); <u>Hill v. Lockheed Martin Logistics Mgmt., Inc.</u>, 354 F.3d 277, 293–94 (4th Cir. 2004) (en banc), <u>abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar</u>, 570 U.S. 338 (2013). Thus, Felton has failed to create a genuine issue of material fact regarding whether he was meeting Moneysworth's legitimate expectations at the time of his discharge. <u>See, e.g., Ruff</u>, 226 F. App'x at 301–02; <u>Laber</u>, 438 F.3d at 430–31; <u>Hill</u>, 354 F.3d at 298; <u>Walsh</u>, 121 F.3d 6702, at *2; <u>Howard</u>, 262 F. Supp. 3d at 335. He was not.

13

Alternatively, Felton has not created a genuine issue of material fact concerning whether, after Felton's discharge, Moneysworth replaced Felton with someone of comparable qualifications who was substantially younger. See, e.g., Causey, 162 F.3d at 802; Walsh, 121 F.3d 6702, at *2. Moneysworth did not. Accordingly, Felton has failed to prove the third or fourth elements of his prima facie case, and the court grants summary judgment to Moneysworth on Felton's ADEA claim.

Alternatively, even if Felton established a prima facie case of age discrimination, Felton has not raised a genuine issue of material fact concerning whether Moneysworth's reasons for his termination were pretextual. Moneysworth has articulated legitimate, non-discriminatory reasons for Felton's discharge. Moneysworth's non-discriminatory reasons boil down to poor performance. Accordingly, the burden shifts back to Felton to provide evidence creating a genuine issue of material fact concerning whether Moneysworth's explanation for Felton's termination is a pretext for intentional age discrimination. See, e.g., Holland, 487 F.3d at 214.

A plaintiff can show pretext by proving that a defendant's explanation for its employment decision is "unworthy of credence" or false. Reeves, 530 U.S. at 147. The plaintiff, however, may not "simply show the articulated reason is false; he must also show that the employer discriminated against him on the basis of age." Laber, 438 F.3d at 430–31. In certain cases, the fact-finder may infer discrimination from the articulated reason's falsity. See id. at 431; Rowe v. Marley Co., 233 F.3d 825, 830 (4th Cir. 2000). However, an employer is entitled to summary judgment on the issue of pretext if the employee "create[s] only a weak issue of fact as to whether the employer's reason [is] untrue and there [is] abundant and uncontroverted independent evidence that no discrimination had occurred." Reeves, 530 U.S. at 148. Moreover, "a plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory

14

reasons for a discharge." Dockins v. Benchmark Commc'ns, 176 F.3d 745, 749 (4th Cir. 1999) (quotation omitted).

Felton disputes Moneysworth's allegations of poor performance. The record (even viewed in the light most favorable to Felton) belies this argument. Moreover, no evidence suggests that McCauley revised the schedule because of Felton's age or that the Keenans terminated Felton's employment because of Felton's age. Likewise, although Felton opines that Moneysworth treated Dontae Stallings and LaDon White better than it treated him, Felton is not similarly situated with Stallings or White, and no evidence suggests that any differential treatment was because of Felton's, Stallings's, or White's age. See, e.g., Lightner v. City of Wilmington, 545 F.3d 260, 264–65 (4th Cir. 2008); Cook v. CSX Transp. Corp., 988 F.2d 507, 512 (4th Cir. 1993); Moore v. City of Charlotte, 754 F.2d 1100, 1105–07 (4th Cir. 1985). Thus, the court grants summary judgment to Moneysworth on Felton's age discrimination claim. See, e.g., Rowe, 233 F.3d at 831; Howard, 262 F. Supp. 3d at 335–36.

> As for Felton's retaliation claim, the ADEA makes it unlawful
>
> for an employer to discriminate against any of his employees or applicants for employment . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

29 U.S.C. § 623(d); see Gomez-Perez v. Potter, 553 U.S. 474, 486 (2008); Laber, 438 F.3d at 432; Baqir v. Principi, 434 F.3d 733, 747–48 (4th Cir. 2006). Felton lacks direct evidence of retaliation and relies on the McDonnell Douglas framework.

Under McDonnell Douglas, a plaintiff must first establish a prima facie case of retaliation. See, e.g., Baqir., 434 F.3d at 747. To establish a prima facie case of retaliation under the ADEA, a plaintiff must show that (1) he engaged in protected activity; (2) his employer took an action

15

against him that a reasonable employee would find materially adverse; and (3) the employer took the materially adverse employment action because of the protected activity. See, e.g., id.; accord Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 250 (4th Cir. 2015); Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 271 (4th Cir. 2015) (en banc); Balas v. Huntington Ingalls Indus., Inc., 711 F.3d 401, 410 (4th Cir. 2013).

Even viewing the record in the light most favorable to Felton, the record demonstrates that Felton never engaged in protected activity under the ADEA. Before Moneysworth terminated Felton's employment, Felton complained to McCauley and others about his job duties and the revised schedule. Felton, however, never "opposed any practice made unlawful" by the ADEA. See 29 U.S.C. § 630(d); Lauth v. Covance, Inc., 863 F.3d 708, 717 (7th Cir. 2017) (general complaints are not protected activity under the ADEA because they do not include discrimination based on age); Blizzard v. Marion Tech. College, 698 F.3d 275, 288–89 (6th Cir. 2012) (same); Fox v. Eagle Distrib. Co., 510 F.3d 587, 591–92 (6th Cir. 2007) (same). Notably, Felton never mentioned his age, the age of his co-workers, or age discrimination while complaining to McCauley and others about his job or the revised schedule. See Freilich v. Upper Chesapeake Health, Inc., 313 F.3d 205, 216 (4th Cir. 2002) ("A plaintiff need not establish that the conduct [he] opposed actually constituted an [ADEA] violation. But a complainant must allege the predicate for a reasonable good faith belief that the behavior [he] is opposing violates the [ADEA].") (citations omitted). Likewise, before Felton's temination, Felton never "made a charge, testified, or participated in any manner in an investigation, proceeding, or litigation" under the ADEA. See 29 U.S.C. § 630(d); Blizzard, 698 F.3d at 288. Thus, Felton has failed to prove the first element of his prima facie case. See Baqir, 434 F.3d at 748.

16

Alternatively, even if Felton did establish a prima facie case, Felton's retaliation claim fails for lack of evidence to rebut Moneysworth's proffered nonretaliatory reason for terminating Felton's employment. See id.; Lauth, 863 F.3d at 717. Thus, the court grants summary judgment to Moneysworth on Felton's ADEA retaliation claim.

## III.

In sum, the court GRANTS defendants' motion for summary judgment [D.E. 15] and DENIES as baseless Felton's motion to quash his deposition [D.E. 14]. Defendants may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close this case.

SO ORDERED. This 2λ day of January 2018.

JAMES C. DEVER III
Chief United States District Judge